IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT D. SAYRE,<br><br>               Plaintiff,<br><br>    v.<br><br>CUSTOMERS BANK,<br><br>               Defendant. | CIVIL ACTION<br>NO. 14-3740 |

## OPINION

**Slomsky, J.**                                                                    **June 6, 2017**

## I.     INTRODUCTION AND BACKGROUND

Plaintiff Robert D. Sayre was employed by ISN Bank ("ISN"), the predecessor of Defendant Customers Bank ("Customers"), as Vice President and Counsel from June 20, 2005 through March 31, 2010. (Sayre Tr., 37:20, 38:10-19, Sept. 19, 2016.) During his employment, Plaintiff received a home equity mortgage loan from ISN. (Exs. J-2, J-3.) While Plaintiff was making timely monthly payments on the mortgage, he was terminated as an employee and did not receive what he believed to be a previously negotiated severance package. (Sayre Tr., 48:11-14, Sept. 19, 2016.) As a result, Plaintiff felt that he had the right to set-off against his mortgage obligation the amount of the severance package that was owed to him.[1] Defendant refused to

---

[1]  Set-offs are often used when attempting to end a financial obligation. A set-off has been described as follows:

> A [s]et-off signifies the subtraction or taking away of one demand from another opposite or cross demand, so as to distinguish the smaller demand and reduce the greater by the amount of the less; or, if the opposite demands are equal, to extinguish both. It was also, formerly, sometimes called stoppage, because the amount to be set-off was stopped or deducted from the cross demand.

Set-off, BLACK'S LAW DICTIONARY (10th ed. 2014).

treat the transaction this way and the mortgage went into default for non-payment. (Id. at 48:23-25; 49:1-3.)

Defendant then notified Plaintiff that the mortgage was in default and that if he did not make the mortgage current, foreclosure proceedings would be instituted against him and he would be liable for Defendant's attorney's fees.[2] (Ex. J-8.) The Notice provided that "[i]f the lender refers your case to its attorneys, but you cure the delinquency before the lender begins legal proceedings against you, you will still be required to pay the reasonable attorney's fees that were actually incurred, up to $50." (Id. at 5.) Plaintiff brought the mortgage current, and legal proceedings were never instituted against him. (Sayre Tr., 51:24-25; 52:1-12, Sept. 19, 2016.) Later, after a period when he made timely monthly mortgage payments, he attempted to sell the property. At that time, in order to do so, Defendant charged him (1) $2,934 in attorney's fees and (2) $535 in appraisal costs. Defendant was forced to pay these costs at closing when the property was sold. (Ex. J-11.)

After protracted Motions practice in this case, the only remaining claim is set forth in Count II, which alleges a violation of the Pennsylvania's Unfair Trade Practices and Consumer Protection Law. The parties contest whether Plaintiff was deceived by the Notice he received after the Mortgage went into default. Plaintiff maintains that he believed only $50 in attorney's fees would be incurred because he paid the delinquency and thereafter made timely payments on

---

[2] This initial communication is known as an Act 6/91 Notice (or the "Notice") and is required to be sent under the provisions of the Pennsylvania Foreclosure Prevention Act, 35 PA. CONST. STAT. ANN. § 1680.401c, which was enacted to establish procedures designed to assist Pennsylvania residents in avoiding foreclosure.

An "Act 6/91 Notice" is a Notice that a mortgagee must send to a mortgagor at least thirty days before initiating foreclosure proceedings. The notice informs the mortgagor of the mortgagee's intention to foreclose, and advises the mortgagor of the ability to cure the default through the Pennsylvania Homeowner's Emergency Mortgage Assistance Program. See 35 PA. CONS. STAT. § 1680.403c; 41 PA. CONS. STAT. § 403.

the Mortgage. Defendant contends that there was no deception because the terms of the Note and the Mortgage allowed it to charge the fees after Plaintiffs' loan went into default.

On September 20, 2016, a one-day bench trial was held before this Court. (Doc. No. 78.) Thereafter, Plaintiff and Defendant submitted proposed Findings of Fact and Conclusions of Law. (Doc. Nos. 79, 80.) Pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure, the Court will now "find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1).

## II.     FINDINGS OF FACT

### A.  The Parties

1. Plaintiff, Robert D. Sayre is a fifty-five year-old attorney currently residing in Riverton, New Jersey. (Sayre Tr., 37:20, Sept. 19, 2016.) From June 20, 2005 to March 31, 2010, Plaintiff served as Vice President and Counsel of ISN Bank ("ISN"). (Id. at 38:10-19.)

2. Defendant, Customers Bank ("Customers") is the successor organization to ISN. (Doc. No. 22 at ¶ 2.) Customers is a Pennsylvania state chartered bank and a wholly-owned subsidiary of Customers Bancorp. Inc.[3] (Id.)

### B.  The Procurement and Terms of the Mortgage

3. On August 27, 2007, while employed with ISN, Plaintiff purchased a residential property located at 2219 Gaul Street, Philadelphia, Pennsylvania (the "Property"). (Sayre Tr., 40:5-10, Sept. 19, 2016.)

4. On September 19, 2007, in connection with the purchase of the Property, Plaintiff obtained a home equity loan from ISN.

---

[3] Customers Bancorp Inc. is a Pennsylvania corporation with an office located at 1501 N. Broad Street, Suite 201, Philadelphia, Pennsylvania, 19122. (Doc. No. 22 at ¶ 2.)

5.  He signed a promissory note (the "Note"). (Exs. J-2; J-3.) The Note was secured by a Mortgage (the "Mortgage") placed on the Property.

6.  The Note and the Mortgage had definitions of when the loan was in default and when expenses by the lender could be collected from the borrower. (Ex. J-2 at 1.)

7.  The Note defined "default" as Plaintiff "fail[ing] to make any payment when due under this Note." In relevant part, the Note provided:

> Attorneys' Fees; Expenses. Lender may hire or pay someone else to help collect this Note if I do not pay. I will pay lender that amount. This includes, subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including reasonable attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and any appeals. If not prohibited by applicable law, I will also pay court costs, in addition to all other sums provided.

(Ex. J-2 at 2.)

8.  Similarly, the Mortgage defined "default" as when the "[g]rantor fails to make any payment when due under the indebtedness." (Ex. J-3 at 8.) Under the "Rights and Remedies on Default" section, the Mortgage provided:

> Attorneys' Fees; Expenses. If Lender institutes any suit or action to enforce any of the terms of this Mortgage, Lender shall be entitled to recover such sum as the court may adjudge reasonable attorneys' fees at trial and upon appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's reasonable attorneys' and Lender's legal expenses, whether or not there is a lawsuit, including reasonable attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the

cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees and title insurance, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

(Ex. J-3 at 11.)

9.   Neither the Note nor the Mortgage has language stating that the default continues after a payment is missed and the Mortgage is brought current. (White Tr., 130:10-25, Sept. 19, 2016.)

**C.  Plaintiff's Attempted Set-off and the Act 6/91 Notice**

10.  On March 30, 2010, Plaintiff was terminated from his position at ISN without cause. (Sayre Tr., 48:11-14, Sept. 19, 2016.)

11.  After his termination, Plaintiff did not receive severance pay from ISN that had been previously negotiated. (Id. at 48:23-25.)

12.  Plaintiff then attempted to use funds from the severance package he expected to receive to set-off his mortgage payments. (Id. at 48:23-25; 49:1-3.)

13.  Plaintiff did not make any payments on the Note and the Mortgage from June 2010 to December 2011. (Id. at 48:23-25; 49:1-3.)

14.  In either May or June 2011, Defendant acquired Plaintiff's loan from ISN through the Federal Deposit Insurance Corporation. (Hansen Tr., 15:16-18, Sept. 19, 2016; White Tr., 109:16-17, Sept. 19, 2016.)

15.  On September 26, 2011, Phillip Berger, Esquire ("Berger"), outside counsel for Defendant, sent a letter to Plaintiff advising him that his Mortgage payments were delinquent and in default. (Ex. J-9.) Berger attached to the letter an "Act 6/91 Notice." (Ex. J-8.) The letter stated the following:

Please be advised that we represent Customers Bank, successor to ISN Bank ("Customers Bank") with regard to the above-captioned matter. You are indebted to Customers Bank pursuant to the terms of that certain promissory note dated September 19, 2007 in the principal sum of $98,000 ("the Note"). You are in default of the Note by failing to pay amounts due and owing thereon.

As a result of your default you are obligated to make payment to Customers Bank of the sum of $80,008.54 which is due and owing as follows:

| | |
|---|---|
| Principal | $72,419.95 |
| Interest as of 9/26/11 | $6,553.64 |
| Late Fees | $649.95 |
| Appraisal Fee | $385.00 |

TOTAL DUE: $80,008.54

Interest continues to accrue on the Note at a rate of $13.37 per diem.

If the amount necessary to bring this loan current pursuant to the terms set forth in the attached Act 6/91 Notice is not paid within thirty (30) days of your receipt of this letter, Customers Bank will take all actions available at law to enforce its rights against you, which may include initiating a mortgage foreclosure action. Pursuant to the terms of the Note, if such actions are taken by Customers Bank, you will be responsible to Customers Bank for its legal expenses incurred to enforce its rights including costs of suit and attorney's fees. Your immediate attention to this matter is required.

If you have any questions, or would like to discuss this matter, please contact me or have your attorney contact me. As it [is] our hope that this matter can be worked out amicably, I look forward to your call.

(Ex. J-9 at 1-2.)

16.     The attached Act 6/91 Notice indicated that the current principal and interest owed was $13,865.60, plus $649.95 in late fees, and $385 in appraisal fees.[4]  (Id. at 4-5.)  The total amount Plaintiff owed Defendant was $14,900.55.  It appears from the record that Plaintiff was first notified that he incurred late charges on an August 2010 invoice.  (Ex. J-12 at 42.)

17.     The Act 6/91 Notice further provided:

> IF THE MORTGAGE IS FORECLOSED UPON - The mortgaged property will be sold by the sheriff to pay off the mortgage debt. <u>If the lender refers your case to its attorneys, but you cure the delinquency before the lender begins legal proceedings against you, you will still be required to pay the reasonable attorney's fees that were actually incurred, up to $50.00. However, if legal proceedings are started against you, you will have to pay all reasonable attorneys' fees actually incurred by the lender even if they exceed $50.00.</u> Any attorney's fees will be added to the amount you owe the lender, which may also include other reasonable costs. If you cure the default within the THIRTY (30) Day period, you will not be required to pay attorney's fees.

(Ex. J-8 at 5.)  (emphasis added.)

18.     The Act 6/91 Notice also gave Plaintiff the option of engaging in a consumer debt counseling program.  (Id. at 8.)  If Plaintiff participated in consumer credit counseling, Defendant was precluded from taking legal action against him for thirty days after the counseling session.[5]

---

[4] On September 16, 2016, this Court held that the provisions of Act 6 were not applicable to the instant mortgage.  The Court found that "Plaintiff [did] not have a claim under Act 6 based on the mortgage that was signed in 2007 because his mortgage was greater than the base figure amount set for residential mortgages."  (Doc. No. 75.)

[5] The Act 6/91 Notice states: "[i]f you meet with one of the consumer credit counseling agencies listed at the end of this notice, the lender may NOT take action against you for thirty (30) days after the date of this meeting."  (Ex. J-8 at 3.)

19. Kathleen Hansen ("Hansen"), an employee in Defendant's special assets group, was copied on Berger's letter and was aware that it had been sent to Plaintiff. (Hansen Tr., 19:5-23, Sept. 19, 2016; Ex. J-9 at 2.)

20. On October 29, 2011, Sayre participated in a consumer counseling program with Acorn Housing Corporation ("Acorn"). (Sayre Tr., 51:24-25; 52; 52:1-12, Sept. 19, 2016; Ex. J-11.)

21. After meeting with Plaintiff, Acorn notified Defendant of Plaintiff's participation in the counseling program. (Ex. J-11.)

22. On December 12, 2011, Plaintiff brought the loan current by paying the total amount noted in Berger's September 26 letter. (Sayre Tr., 51:24-25; 52:1-12, Sept. 19, 2016.)

23. Hansen testified that Defendant received payment of the outstanding balance on December 12, 2011, and that Defendant did not institute any legal proceedings against Plaintiff. (Id. at 56:12-25; Hansen Tr., 24:20-25; 25:1-7, Sept. 19, 2016.)

24. Additionally, Robert White ("White"), an Executive Vice President of Defendant, testified that on December 12, 2011, Defendant applied Plaintiff's payment to the outstanding balance and the loan was no longer delinquent as of December 14, 2011. (White Tr., 104:23-25; 105:1-20, Sept. 19, 2016.)

25. After bringing the loan current, Plaintiff made all subsequent payments timely. (Sayre Tr., 60:9-11, Sept. 19, 2016.)

**D. Berger's Invoices to Defendant for Legal Services Rendered**

26. Berger billed Defendant for his legal services on Plaintiff's file while the Mortgage was in default and after it had been brought current.

27. Berger initially sent Defendant three invoices for work he completed while the Mortgage was in default. (Ex. J-16 at 7-14.)

28. First, on October 5, 2011, Berger billed Defendant $341 for opening an account on Plaintiff with his law office, drafting a letter to Hansen, reviewing loan documents, drafting the Act 6/91 Notice, and sending the letter and Act 6/91 Notice to Plaintiff. (Ex. J-16 at 7.)

29. Second, on November 4, 2011, Berger billed Defendant $806 for reviewing and researching claims made by Plaintiff against Defendant, and making phone calls related to the matter. (Ex. J-16 at 9.)

30. Lastly, on December 6, 2011, Berger billed Defendant $319 for reviewing the letter from Acorn regarding Plaintiff's meeting, emailing Hansen, receiving Sayre's demand for documents, and for photocopying expenses. (Ex. J-16 at 12.)

31. Hansen admitted that Berger continued to do legal work for Defendant on Plaintiff's Mortgage after December 14, 2011, the date on which the Mortgage was no longer in default. (Hansen Tr., 28:15-25; 29:1-25, Sept. 19, 2016.)

32. An invoice sent to Hansen on January 4, 2012 listed numerous charges for work that Berger completed after the mortgage was no longer in default. (Ex. J-16 at 15.) Specifically, Berger billed for work on December 14, 15, 19, 20, and 21, 2011 totaling $1,356.01. (Id.)

33. This work consisted of responding to emails, reviewing correspondence from Plaintiff, reviewing a memorandum and case law, and conducting legal research on Westlaw. (Id.)

34. On February 8, 2012, Berger sent Defendant another invoice for $52 for responding to emails, reviewing bank requirements, and drafting a memorandum for Plaintiff's file. (Id. at 18.)

35. The total amount billed for Berger's legal services was $2,934.01. (Ex. J-16 at 7-18.) This amount included $1,408.01 that Berger billed for services rendered after the loan became current. (Id.)

### E. Appraisals of the Property

36. In addition to legal work, Defendant also had two appraisals done on the Property. (Ex. J-16 at 20, 40.)

37. The first appraisal occurred while the Mortgage was in default. (Ex. J-16 at 20.)

38. On November 11, 2010, Croft Appraisal Services, Inc. did the first appraisal and billed Defendant $385. (Id. at 20.)

39. The second appraisal occurred when the Mortgage was no longer in default. (Ex. J-16 at 40.)

40. On May 30, 2012, Bonsventure Reality LLC did the second appraisal and billed Defendant $150. (Id.)

41. The total amount for both appraisals was $535. (Ex. J-16 at 7-18.)

### F. Sale of the Property and the Pay-off Statement

42. In June 2013, Plaintiff attempted to sell the Property. (Sayre Tr., 59:17-23, Sept. 19, 2016.)

43. Plaintiff requested a pay-off statement from Defendant showing the remaining balance on the Mortgage. (Sayre Tr., 59:25; 60:1-11, Sept. 19, 2016.)

44. On June 12, 2013, a pay-off statement was prepared by Hansen and sent to Plaintiff by the title company handling the closing on the residence. (Id. at 60:16-18; Ex. J-14.)

45. The pay-off statement included attorney's fees and appraisal costs that Plaintiff was not aware of and that had never been listed on any previous loan statement. (Sayre Tr., 60:1-11, Sept. 19, 2016.)

46.     In the monthly Mortgage statements that Plaintiff had received from Customers, there was a line in which Defendant could request the payment of fees or other expenses due. (Ex. J-12.)

47.     Before he received the June 12, 2013 pay-off statement, Plaintiff did not receive notification from Defendant that any late charges, appraisal fees, or other fees were due.

48.     The pay-off statement noted that the total amount owed was $58,547.41, with a per diem charge of $10.09 if the Mortgage was not paid off by 3:30 p.m. on the pay-off date. (Ex. J-14.)

49.     This total included $2,934.01 in legal fees for the work performed by Berger on Plaintiff's file. (Ex. J-14.) The pay-off statement also included the appraisal fees totaling $535. (Ex. J-14.)

50.     Plaintiff called Hansen to dispute the additional costs for the attorney's fees and appraisal fees. (Sayre Tr., 60:19-25, Sept. 19, 2016.)

51.     He advised her that he believed the fees were not collectible under the Act 6/91 Notice and contrary to the terms of the Mortgage. (Id. at 60:19-25.)

52.     Hansen told Plaintiff that the disputed fees would not be removed. (Hansen Tr., 31:21-25, Sept. 19, 2016.)

53.     On July 2, 2013, in order to sell his property, Plaintiff paid the entire amount of $58,547.41 as requested on the pay-off statement, including the attorney's fees and the fees for the appraisals. (Ex. J-16 at 2.)

## III.     CONCLUSIONS OF LAW

As noted previously, in Count II, Plaintiff alleges that Defendant violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 PA. CONS. STAT. ANN. §§ 201-1 to 201-9.3, by collecting from Plaintiff (1) $2,934 in attorney's fees and (2)

$535 in appraisal costs after Defendant represented in the Act 6/91 Notice that Plaintiff could only be charged up to $50 in attorney's fees by timely curing the default.  (Doc. No. 22.)

A one-day bench trial was held on this claim.  During a bench trial, "in addition to resolving legal issues, the [Court's] role . . . includes evaluating the credibility of witnesses and weighing the evidence."  Baker v. Baker, No. 10-1955, 2011 WL 129164, at *1 n.1 (E.D. Pa. Jan. 12, 2011) (citing Fed. R. Civ. P. 52(a); Inwood Labs, Inc. v. Ives Labs, Inc., 456 U.S. 844, 856 (1982)).  In accordance with Federal Rule of Civil Procedure 52(a), the Court will now state its conclusions of law.

### A. Plaintiff Has Met His Burden of Proving a Violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law (Count II)

As noted, in Count II, Plaintiff alleges that Defendant violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 PA. CONS. STAT. ANN. §§ 201-1 to 201-9.3.  Under  Section 201-9.2:

> (a) Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act, may bring a private action to recover actual damages or one hundred dollars ($100), whichever is greater. The court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars ($100), and may provide such additional relief as it deems necessary or proper. The court may award to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorney fees.

73 PA. CONS. STAT. ANN. §§ 201-9.2(a).[6]

"Person" is defined in the UTPCPL as "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entities."  73 PA. CONS. STAT.

---

[6] There are twenty-one prohibited acts or practices in Section 3 of the UTPCPL.  Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are defined in subclauses (i) through (xxi) of UTPCPL Section 201-4.  73 PA. CONS. STAT. ANN. § 201-3.

ANN. §§ 201-2. Here, Plaintiff is a "person" within the statutory definition of Section 201-2 of the UTPCPL. (Sayre Tr., 37:20, Sept. 19, 2016.) Moreover, the business of a mortgage lender is a sale of a service within the scope of the UTPCPL. In re Smith v. Commercial Banking Corp., 866 F.3d 576, 582 (3d Cir. 1989). The coverage of the UTPCPL is not limited to the initial mortgage agreement only, but includes all transactions and dealings between the parties during the life of the mortgage. Id.

Plaintiff asserts Defendant violated Section 201-2(xxi) of the UTPCPL. (Doc. No. 22 at ¶¶ 63-66.) Section 201-2(4)(xxi) is commonly referred to as the UTPCPL's "catch-all" provision. Section 201-2(4)(xxi) states that, "Unfair methods of competition and unfair or deceptive acts or practices mean any one or more of the following: [e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 PA. CONS. STAT. ANN. § 201-2(4)(xxi). (internal emphasis omitted). See generally, Seldon v. Home Loan Servs., Inc., 647 F. Supp. 2d 451, 470 (E.D. Pa. 2009); Bennett v. A.T. Masterpiece Homes at Broadsprings, LLC, 40 A.3d 145, 154 (Pa. Super. Ct. 2012). In 1996, the Pennsylvania General Assembly amended the catch-all provision of Section 201-2(4)(xxi) to include the phrase "or deceptive." Aberts v. Verna, No. 1214 EDA 2016, 2017 WL 319026, at *12 (Pa. Super. Ct. Jan. 23, 2017). The addition of "or deceptive" has been held to expand the conduct that is considered fraudulent under the statute. Schnell v. Bank of N.Y. Mellon, 828 F. Supp. 2d 798, 807 (E.D. Pa. 2011) (finding deceptive conduct alone is sufficient to satisfy the catchall provision of Section 201-2(4)(xxi)); Vassalotti v. Wells Fargo Bank, N.A., 732 F. Supp. 2d 503, 510 n.7 (E.D. Pa. 2010) (noting that a plaintiff need not establish common law fraud to satisfy the UTPCPL). The UTPCPL also extends to "misleading conduct" by the defendant. Bennett,

40 A.3d at 155 (holding that trial court was proper to instruct the jury that misleading conduct will satisfy the UTPCPL).

The Pennsylvania Supreme Court has stated that courts should liberally construe the UTPCPL in order to achieve the legislative goal of consumer protection. Com. by Creamer v. Monumental Properties, Inc., 329 A.2d 812, 816 (Pa. 1974); see also Bennett, 40 A.3d at 151.

In Sheldon v. Home Loan Servs. Inc., the Court described elements of a claim under the UTPCPL's catch-all provision:

> First, a plaintiff must allege facts showing a "deceptive act," that is, "conduct that is likely to deceive a consumer acting reasonably under similar circumstances." Black's Law Dictionary 455 (8th ed. 2004); see also In re Patterson, 263 B.R. 82, 94 (Bankr. E.D. Pa. 2001) (defining deceptive act as " 'the act of intentionally giving a false impression' " or " 'a tort arising from a false representation made knowingly or recklessly with the intent that another person should detrimentally rely on it' ") (quoting Black's Law Dictionary[,] 413 (7th ed. 1999)).

> Next, the plaintiff must allege justifiable reliance, in other words "that he justifiably bought the product in the first place (or engaged in some other detrimental activity) because of the [defendant's] misrepresentation" or deceptive conduct. [Hunt v. U.S. Tobacco Co., 538 F.3d 217, 223 n.14 (3d Cir. 2008)].

> Finally, the plaintiff must allege that this justifiable reliance caused ascertainable loss. 73 Pa. Stat. Ann. § 201–9.1(a).

Seldon, 647 F. Supp. 2d at 470.

First, the Court finds that Defendant engaged in a "deceptive" act under the meaning of 201-2(4)(xxi). As noted, under Section 201-2(4)(xxi), a defendant must engage in an act that is "fraudulent or deceptive." 73 PA. CONS. STAT. ANN. § 201-2(4)(xxi). Here, Defendant is responsible for the deceptive statements made to Plaintiff in the Act 6/91 Notice which was sent by Defendant's agent, attorney Phillip Berger. In the language of the Act 6/91 Notice, Defendant stated that Plaintiff would not be liable to pay more than $50 in attorney's fees if he cured his

default before legal proceedings were instituted against him.[7]  (Ex. J-8 at 4-5.)  Plaintiff paid the

overdue balance on December 12, 2011, before legal proceedings were instituted against him.

(Hansen Tr., 24:20-25; 25:1-7, Sept. 19, 2016; White Tr., 104:23-25; 105:1-20, Sept. 19, 2016.)

---

[7] At the time this Notice was sent in September 2011, neither Berger, Defendant, nor Plaintiff
were aware that Act 6 did not apply because Plaintiff's Mortgage was over the threshold
amount to qualify as a residential mortgage.  As the Court previously found at the summary
judgment stage of this case:

> The terms of Act 6 apply only to "residential mortgages."  41 PA. CONS. STAT.
> ANN. § 406.  A residential mortgage is defined as follows:
>
>> …[an] obligation to pay a sum of money in an original bona fide
>> principal amount of the base figure or less, evidenced by a security
>> document and secured by a lien upon real property located within
>> this Commonwealth containing two or fewer residential units or on
>> which two or fewer residential units are to be constructed and shall
>> include such an obligation on a condominium unit.
>
> Id.  At present the "base figure" is $217,873.  This figure is adjusted annually for
> inflation.  41 PA. CONS. STAT. ANN. § 101.  However, prior to September 8, 2008,
> when Act 6 was amended, the base figure was $50,000.
>
> Plaintiff entered into a mortgage on September 19, 2007.  At that time, the base
> figure was $50,000.  This amount is applicable to Plaintiff's mortgage which
> totaled $98,000.  The present base figure of $217,873 is not applied retroactively
> to his residential purchase.  Therefore, the provisions in Act 6 do not afford
> Plaintiff any relief.
>
> Here, Plaintiff does not have a claim under Act 6 based on the mortgage that was
> signed in 2007 because his mortgage was greater than the base figure amount set
> for residential mortgages.  See Trunzo v. Citi Mortgage, 43 F. Supp. 3d 517, 535
> (W.D. Pa. 2014) ("Notwithstanding the 2008 amendment, courts have looked to
> the bona fide principal amount set at the time of the transaction, and not at the
> subsequent date, for considering whether a residential mortgage comes under Act
> 6.").  See also In re Harris-Pena, 446 B.R. 178, 187 (Bankr. E.D. Pa. 2009)
> (finding the pre-2008 base figure of $50,000 applied to a mortgage loan that
> closed in 2001, choosing to not apply the newly changed laws to the present
> case); In re Grayboyes, No. 05-178, 2006 WL 437546, at *7 (E.D. Pa. Feb. 22,
> 2006) aff'd sub nom. In re Graboyes, 223 F. App'x 112 (3d Cir. 2007) ("The
> principal amount of a loan must be measured at the time of the consummation of
> the transaction, rather than at subsequent dates.").  As a result, Plaintiff does not

Despite Plaintiff being an attorney, the Court finds that Plaintiff did not believe that he would be liable to pay more than $50 in attorney's fees if he brought the loan current. Moreover, the Act 6/91 Notice never mentioned that appraisal fees also could be collected. The monthly Mortgage statements that Plaintiff received from January 2012 to June 2013 from Defendant never stated that Plaintiff owed Defendant attorney's fees or appraisal fees. (Ex. J-12.) Furthermore, after Plaintiff brought the Mortgage current, Defendant continued to charge for attorney's fees on Plaintiff's file. (Ex. J-16 at 7-14.) When Plaintiff attempted to sell the Property, he was charged $2,934.01 in attorney's fees even though no legal proceedings had been instituted against him while the Mortgage was in default. (Ex. J-14.) He was also charged $535 for appraisal fees. Under these circumstances, Defendants conduct clearly amounts to deceptive acts.

Second, Plaintiff justifiably relied upon the Defendant's conduct. As the Third Circuit has noted about justifiable reliance under the UPTCPL:

> In determining whether reliance was justifiable, the Supreme Court of Pennsylvania has held that "[n]either this Court nor a jury can consider the issue

---

> have a claim under Act 6. There is no genuine issue of material fact because the facts in this case show that Act 6 does not apply.

(Doc. No. 75 at 9-11.)

The fact that the provisions of Act 6 does not afford Plaintiff relief as a separate cause of action does not undermine the claim in Count II that Plaintiff was deceived by the Act 6/91 Notice he received from attorney Berger. In addition, both "default" provisions of the Note and Mortgage contain language that would qualify the amount of attorney's fees and expenses that could be collected. The Note states "subject to any limits under applicable law." The Mortgage states "and to the extent not prohibited by law." Needless to say, if the provisions of Act 6 applied here, they would limit the language in the Note and Mortgage under these quoted provisions. Even though Act 6 does not apply here, at the time the Note and Mortgage were written, the parties did believe it applied and the Act 6/91 Notice was sent pursuant to Pennsylvania law. This scenario reinforces the deception perpetrated on Plaintiff by Defendant through its agent, Attorney Berger.

16

without considering the relationship of the parties involved and the nature of the transaction."

Mohney v. Foreny, 93 F. App'x 391, 394 (3d Cir. 2004). The question of justifiable reliance depends on whether the plaintiff "knew or should have known that the information supplied was false." Boardakan Rest. LLC v. Gordon Grp. Holdings, LLC, No. 11-5675, 2016 WL 6213035, at *18 (E.D. Pa. Oct. 24, 2016) (quoting Fort Washington Res. v. Tannen, 858 F. Supp. 455, 461 (E.D. Pa. 1994)).

Plaintiff justifiably relied on the Act 6/91 Notice he received by engaging in counseling and paying the delinquent amount. By so doing, he believed that his liability for attorney's fees was capped at $50. He did not believe this information was false, and thereafter made timely monthly Mortgage payments.

The facts here do not show that Plaintiff should have known that he was going to be charged legal fees in excess of $50 and appraisal costs. To support its claim that Plaintiff should have known, Defendant points to the Note and Mortgage provisions quoted above. But both have qualifying language that was relied upon by the parties when Defendant's agent sent the Act 6/91 Notice.

In addition, this case involves the unique scenario where Plaintiff was a former counsel for Defendant. (Sayre Tr., 38:10-19, Sept. 19, 2016.) Even with this relationship in mind, the record is devoid of facts suggesting that Plaintiff's previous position imputed him with knowledge that he would be charged excessively for attorney's fees. (See generally, Sayre Tr., Sept. 19, 2016.)

Third, Plaintiff's justifiable reliance resulted in an ascertainable monetary loss. Although he was not obligated to do so, Plaintiff paid to $3,519.01 in attorney's fees and appraisal fees as listed on the pay-off statement when he only had to pay at most $50. Plaintiff paid these fees in

order to sell the Property and satisfy his Mortgage obligation. (Ex. J-14.) Accordingly, Plaintiff

suffered an ascertainable loss of $3,519.01, minus the $50 he believed he could owe if he

followed the terms of the Act 6/91 Notice.[8]

### B. Plaintiff's Recovery is Not Barred by the Economic Loss Doctrine

Defendant contends that the Court must find in its favor because the economic loss

doctrine applies in this case.[9] The economic loss doctrine "prohibits plaintiffs from recovering in

---

[8] Although Act 6 does not apply in this case, Plaintiff was on notice that he would be required to pay $50 in legal fees regardless of whether Defendant initiated litigation. Therefore, the $50 will be deducted from the amount of actual damages sustained.

[9] Plaintiff argues that Defendant's reliance on the economic loss doctrine has been waived because it is an affirmative defense which Defendant did not plead until trial. (Doc. No. 79 at 11.) No legal authority for this claim has been submitted by Plaintiff and the Court is unable to find any such precedent. In many cases, however, the economic loss doctrine is raised in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. Related to Rule 12(b)(6) is Federal Rule of Civil Procedure 12(h) which states in relevant part:

(h) Waiving and Preserving Certain Defenses.

(1) When Some Are Waived. A party waives any defense listed in Rule 12(b)(2)-(5) by:

(A) omitting it from a motion in the circumstances described in Rule 12(g)(2); or

(B) failing to either:

(i) make it by motion under this rule; or

(ii) include it in a responsive pleading or in an amendment allowed by Rule 15(a)(1) as a matter of course.

(2) When to Raise Others. Failure to state a claim upon which relief can be granted, to join a person required by Rule 19(b), or to state a legal defense to a claim may be raised:

(A) in any pleading allowed or ordered under Rule 7(a);

(B) by a motion under Rule 12(c); or

tort economic losses to which their entitlement flows only from a contract." Werwinski v. Ford Motor Co., 286 F.3d 661, 671 (3d Cir. 2002); Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 618 (3d Cir. 1995). In Murphy v. State Farm Mut. Auto. Ins. Co., the court noted the following on the application of the economic loss doctrine in Pennsylvania:

> While the issue of whether the economic loss doctrine applies to statutory claims under the UTPCPL has been the subject of much dispute in Pennsylvania, and the Pennsylvania Supreme Court has yet to rule on whether the economic loss doctrine bars intentional fraud and deceptive practices claims stemming from a statute such as the UTPCPL, the Third Circuit has predicted that the Pennsylvania Supreme Court would hold that UTPCPL claims are barred by the economic loss doctrine. Werwinski, 286 F.3d at 680-81. After Werwinski, the Pennsylvania Superior Court held in Knight v. Springfield Hyundai, 81 A.3d 940, 952 (Pa. Super. Ct. 2013), that UTPCPL claims are not subject to the economic loss doctrine because they are statutory claims that do not sound in negligence.

No. 16-2922, 2016 WL 4917597, at *5 (E.D. Pa. Sept. 15, 2016).

---

(C) at trial.

Fed.R.Civ.P 12(h). (emphasis added.) Under this Rule, it appears that the economic loss doctrine can be asserted at trial.

Further, in St. Paul Mercury Ins. Co. v. the Viking Corp., the court held that

> Viking's failure to raise economic loss as an affirmative defense in its first responsive pleading does not lead to a waiver of this defense. The economic loss doctrine is not an affirmative defense which can be waived under Fed. R. Civ. P. 12(h)(1).

No. 04-C-1124, 2007 WL 129063 (E.D. Wis. Jan. 12, 2007).

In Tarrant Cnty. Hosp. Dist. v. GE Automation Servs., Inc., the Court noted:

> [T]he economic loss rule is not an affirmative defense . . . it [is] a court-adopted rule for interpreting whether a party is barred from seeking damages in an action alleging tort injuries resulting from a contract between the parties.

156 S.W.3d 885, 895 (Tex. Ct. App. Jan. 27, 2005).

Because the economic loss doctrine is not an affirmative defense that can be waived, and is more akin to a challenge that a party has failed to state a claim upon which relief can be granted, the doctrine may be asserted at trial, even though here it affords Defendant no relief.

Thus, if the economic loss doctrine applies in this case, Plaintiffs claim in Count II for a violation of the UTPCPL would fail. However, the economic loss doctrine does not apply here because Plaintiff was given the deceptive information in the Act 6/91 Notice, which is not a contract that the parties entered into. The Act 6/91 Notice attached to Berger's letter is the crux of the deception in this case, not the Note or the Mortgage.[10] Although the Note and Mortgage were contractual agreements between the parties, Berger's letter and the attached Act 6/91 Notice were not contractual. Therefore, the economic loss doctrine does not apply to Plaintiff's claims in the instant case.

## IV. DAMAGES

Next, the Court will award damages in this case. Plaintiff has requested "actual damages, treble damages, and legal interest for Customers' violation of the Act . . . [and for the] Court to schedule a hearing to assess reasonable counsel fees, which are permitted to be awarded under the Act." (Doc. No. 79 at 13.) Under Section 201-9(a):

> (a) Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act, may bring a private action to recover actual damages or one hundred dollars ($100), whichever is greater. The court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars ($100), and may provide such additional relief as it deems necessary or proper. The court may award to the

---

[10] Plaintiff states in his post-trial memorandum that "it became clear to him the length to which Customers was violating the terms of the loan documents and Act 6/91 Notice. Berger's description of the work and time spent made it clear to Sayre that much of his legal services had nothing to do with enforcement of the bank's rights and remedies upon default under the Note." (Doc. No. 79 at ¶ 19.) Plaintiff continues and states that "[a]s a result of submitting its Pay[-]off Letter in June of 2013, Customers collected attorney's fees and appraisal fees from Sayre, which fees were inconsistent with the Act 6/91 Notice sent by Berger to Sayre on September 27, 2011." (Id. at ¶ 35.) Although Plaintiff argues that the terms of the loan documents, the Note and Mortgage, were violated, he clearly relies upon the misrepresentation made in Berger's letter and the attached Act 6/91 Notice as the deceptive acts. These acts give rise to the violation alleged in Count II of the Amended Complaint.

plaintiff, in addition to other relief provided in this section, costs and reasonable attorney fees.

PA. CONS. STAT. ANN. § 201-9(a).

The Court will direct Defendant to pay Plaintiff actual damages in the amount of $3,469.01 for the overcharged legal fees and the appraisal fees Plaintiff had to pay. The Court also finds that treble damages are warranted under the facts. Accordingly, the Court will award to Plaintiff three times the actual damages he sustained in the amount of $10,407.03.

The Court will deny at this time Plaintiff's request for a hearing on reasonable attorney's fees. Instead, the Court will direct Plaintiff's counsel to follow Federal Rule of Civil Procedure Rule 54(d)(2):

> (A) Claim to Be by Motion. A claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages.
>
> (B) Timing and Contents of the Motion. Unless a statute or a court order provides otherwise, the motion must:
>
>> (i) be filed no later than 14 days after the entry of judgment;
>> (ii) specify the judgment and the statute, rule, or other grounds entitling the movant to the award;
>> (iii) state the amount sought or provide a fair estimate of it; and
>> (iv) disclose, if the court so orders, the terms of any agreement about fees for the services for which the claim is made.

Fed. R. Civ. P. 54(d)(2). Plaintiff's counsel may submit an appropriate Motion for attorney's fees under this Rule.

In addition, Plaintiff is entitled to receive interest on the $10,407.03. The parties are encouraged to jointly calculate the appropriate amount. If no agreement can be reached, the parties are directed to submit memoranda of law within seven (7) days of the filing of this Opinion and Order on the correct calculation of interest.

## V. CONCLUSION

For the foregoing reasons, the Court will award judgment in favor of Plaintiff Robert D. Sayre and against Defendant Customer's Bank.  An appropriate Order follows.